IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES EDWARD GRANT,

                Plaintiff,
  v.

JEFFERY GILL, JOSEPH BEAHM,                OPINION & ORDER
JESSE SCHNEIDER, BRIAN GREFF,
GABRIEL UMENTUM, DEREK SCHOUTEN,          14-cv-436-jdp
MICHAEL J. LUNDE, LUKAS MARWITZ,
TODD OLIG, JUSTEN KITZMAN, TONY MELI,
and AARON BEDKER,

                Defendants.

---

Plaintiff James Edward Grant, a former state of Wisconsin inmate currently living in Madison, brings claims that defendant prison officials used excessive force on him while they escorted him to a disciplinary hearing, and that he was sexually assaulted during a strip search while housed at the Waupun Correctional Institution (WCI). Defendants have filed a motion for summary judgment. After I ordered supplemental briefing and gave Grant a chance to conform his proposed findings of fact to this court's rules, *see* Dkt. 54, the motion for summary judgment is now fully briefed. I conclude that there are disputed issues of material fact over defendant Jeremy Gill's decision to use force against Grant that need to be resolved at trial. I will grant summary judgment to defendants on the remainder of Grant's claims.

UNDISPUTED FACTS

Plaintiff James Edward Grant is no longer in prison. The events in question took place while Grant was incarcerated at WCI. At that time, defendants Jeffrey Gill, Joseph Beahm, Michael Lunde, Aaron Bedker, Todd Olig, and Justen Kitzman were employed at WCI as

correctional officers. Defendants Gabriel Umentum, Derek Schouten, and Lukas Marwitz worked as correctional sergeants. Defendant Jesse Schneider was a lieutenant. Defendant Brian Greff was a corrections program supervisor. Defendant Anthony Meli was the security director.

On May 15, 2014, at about 2:00 p.m., Grant was scheduled to have "due process hearings" on three conduct reports he had received. None of the defendants were directly involved in the events underlying those conduct reports.

Grant says that on that morning, during the passing of breakfast meals in the Restrictive Housing Unit, defendant Gill came to Grant's cell and asked him, "[A]re you going to your Due Process Hearing?" Grant said yes. Gill responded, "Well you don't get breakfast then." Grant did not receive breakfast that day.

At about 2:00 p.m., defendants Gill, Bedker, and Umentum came to escort Grant to the hearing room. Grant says that Gill told him, "If you look at me I will interpret that as a threat to my safety." Gill placed Grant into wrist restraints and directed him to remain facing forward once his cell door was opened. Grant did not say that the wrist restraints were too tight.

Most of the escort and following events is captured on the recording made by Bedker. *See* Dkt. 43-1. Gill began escorting Grant to the hearing room. Bedker recorded the escort. Umentum followed behind by several feet. As soon as the escort began, Grant started talking directly to the camera making statements that defendants Beahm and Gill had broken another inmate's thumb. Grant was told multiple times during the escort by Gill to remain facing forward, because he turned his head several times. He also accused Gill of squeezing his arm too hard during the escort.

Grant and Gill and entered the "due process room" where the hearing would be held. They moved into the room, out of the range of the camera held by Bedker, who was still following.[1] At this point, Gill says that Grant turned his head to the left, which Gill took as a threat because he thought that Grant was looking to see where Gill was so that he could prepare an attack. Grant admits that he did not keep his head forward, but he states that he looked down when Gill grabbed Grant's hand to handcuff it to a ring inside the hearing room. Gill then pushed Grant into the wall while loudly telling him to continue facing forward. Gill says that he "directed" Grant into the wall. Grant says that Gill "threw" him into the wall.

This happened as Umentum was walking into the room. It is unclear from Umentum's declaration whether he saw Gill's use of force. Umentum radioed for other security staff to respond to the due process room in the Restrictive Housing Unit to assist, and he requested that staff bring leg restraints. Bedker entered the due process room about three or four seconds after Gill.

Defendants Beahm and Schneider responded to Umentum's radio call. Beahm applied leg restraints to Grant. Because of Grant's reported non-compliance, Schneider decided to place Grant into "control status" and for staff to escort Grant to a strip cell for a strip search. Control status can be used for segregation inmates who exhibit disruptive behavior. If an inmate is placed into control status, the inmate must undergo a strip search before he is placed in the control cell. "Staff-assisted" strip searches, in which a restrained inmate's body parts are

---

[1] Grant says that it was "ironic" that Umentum walked through view of the camera as Grant and Gill entered the room. By this I take him to mean that Umentum was attempting to block the camera. The state says that Umentum "got directly behind defendant Gill and Grant so he could keep a direct visual." Dkt. 51, at 12, ¶ 35. This is ultimately immaterial, as it was the doorway of the due process room itself that obscured Gill pushing Grant into the wall, not Umentum.

manipulated by prison officials, are used when an inmate has already demonstrated non-compliance.

Once Grant was secured at the strip cell, Gill was relieved by defendant Schouten. Gill had no involvement with the strip search. A nurse checked Grant's complaint of injuries: she stated that he had no markings on his right wrist, and that she could fit three fingers in each ankle restraint. In his deposition, Grant admits that he did not sustain any physical injury from the events, although he does say that he suffered pain in his jaw, and that the restraints or defendants' actions hurt his wrists and ankles.

Beahm conducted the strip search. The parties agree that Umentum secured one of Grant's arms during the search. They disagree about whether defendants Schouten or Olig secured the other arm. Defendants Greff and Lunde were also present for at least part of the strip search but did not directly take part. Defendants Marwitz and Kitzman were not present for any of these events.

Bedker's footage shows how Beahm conducted the strip search. Grant remained handcuffed with his face toward the strip cage. Beahm cut off Grant's clothes and had him kneel. Beahm used bladed hands to lift Grant's scrotum and spread Grant's buttocks. Beahm also inspected Grant's mouth, hair, ears, fingers, armpits, feet, and toes. Beahm found no contraband. Grant's midsection was wrapped in a towel and he was taken to his cell. He did not appear at his due process hearing.

Gill gave Grant a conduct report for disobeying orders during the escort and for lying when he said that Beahm and Gill had broken another inmate's thumb. Defendant Meli reviewed the conduct report and allowed it to proceed as a major offense.

ANALYSIS

Grant brings claims that defendants retaliated against him, used excessive force against him, and performed an unnecessary strip search for the purpose of humiliating him.[2]

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

**A. Excessive force**

In his operative complaint, Grant alleged that defendants violated the Eighth Amendment by using excessive force against him at several points during the events detailed

---

[2] In a footnote to its brief-in-chief, defendants contend that Grant's *in forma pauperis* status should be revoked because his claims in this case involve events concerning past harm, and he has "struck out" under 28 U.S.C. § 1915(g). I caution the state against raising arguments in footnotes. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("We have often said that a party can waive an argument by presenting it only in an undeveloped footnote"). But in any event, defendants' argument is meritless because I have already concluded that Grant's allegations about being sexually assaulted could pass muster under the "imminent danger" exception to § 1915(g). *See* Dkt. 2, at 2 n.1 & Dkt. 14, at 1 n.1. Grant's transfer away from the Waupun Correctional Institution and his eventual release after he filed the original complaint in this lawsuit do not deprive him of the ability to proceed *in forma pauperis* in this case. *Ciarpaglini v. Saini*, 352 F.3d 328, 330 (7th Cir. 2003).

above. "The unnecessary and wanton infliction of pain on a prisoner violates his rights under the Eighth Amendment." *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) (internal quotation omitted). To prevail on a claim of excessive force against a correctional officer, a plaintiff must prove that the officer applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The factors relevant to this determination include (1) why force was needed; (2) how much force was used; (3) the extent of the injury inflicted; (4) whether the defendant perceived a threat to the safety of staff and prisoners; and (5) whether efforts were made to temper the severity of the force. *Whitley*, 475 U.S. at 321.

1. **Handcuffs**

Grant alleged that at the beginning of the escort, defendant Gill maliciously placed handcuffs on him tightly. But at summary judgment, Grant does not adduce any evidence supporting this allegation. Grant says nothing in his opposition materials about the handcuffs. In the video, Grant did not say anything to Gill about the handcuffs being too tight. And in his deposition, Grant said that he was not physically injured during the entire sequence of events. There is simply nothing in the summary judgment record supporting this claim.

At this stage of the case, it is Grant's responsibility to put on evidence showing Gill's deliberate indifference. Because he fails to provide any evidence showing that Gill maliciously handcuffed him tightly, I will dismiss this claim.

2. **Squeezing arm**

During the escort, Grant complained about Gill squeezing his arm as he led him toward the hearing room. But not "every malevolent touch by a prison guard gives rise to a federal

6

cause of action." *Hudson*, 503 U.S. at 10. "Even if an officer's use of force serves no good-faith disciplinary purpose, the force may be so 'de minimis'[3] that it does not violate the Eighth Amendment." *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009) (citing *Hudson*, 503 U.S. at 10). *See also DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000) (officer's shove of prisoner into door frame considered de minimis); *Lunsford v. Bennett*, 17 F.3d 1574, 1582 (7th Cir. 1994) (pouring bucket of water on prisoner and causing bucket to hit him in the head considered de minimis).

Here, Gill's grip on Grant was arguably fully justified by the penological task at hand: escort to the hearing room. The video itself does not establish exactly how hard Gill gripped Grant's arm or how much pain it caused Grant. But even if Gill squeezed harder than was necessary, no reasonable observer could watch the video and conclude that this use of force rose above the de minimis threshold. The video shows a completely unremarkable escort by Gill. At no point does he appear to be applying so much pressure to Gill's arm that a reasonable observer could come close to thinking that his actions violated the Eighth Amendment. Accordingly, I will dismiss this claim.

3. **Push into wall**

It is undisputed that defendant Gill pushed Grant into the wall of the hearing room. The parties characterize it somewhat differently, with Gill saying that he "directed" Grant into the wall, while Grant says that Gill "threw" him into the wall. The view of the incident was obscured in the video because defendant Bedker trailed Gill and Grant as they entered the room.

---

[3] This phrase is based on the legal maxim *de minimis non curat lex*, meaning that "the law does not concern itself with trifles." *See Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012).

7

Gill says that Grant was becoming increasingly agitated, and upon entering the room, Grant looked to his left, toward Gill, which Gill considered to be a "target glance" raising the possibility that Grant was going to attack him or another officer. If a jury believed Gill's version of events, he would be entitled to summary judgment. Prisons are dangerous places and correctional officers need to maintain order and protect themselves. Grant argues that he was never physically violent in prison, but even if this is true, Gill could nevertheless reasonably consider him to be a risk. Gill's shove, if intended to serve a security purpose, would not violate the Eighth Amendment even if the shove was marginally unreasonable given the circumstances. *See Whitley v. Albers*, 475 U.S. at 319 ("The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."); *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) ("Custodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority . . . is to be manageable.").

But because of the difficulty of proving a party's subjective state of mind, cases involving motivation and intent are often inappropriate for summary judgment. *See Alexander v. Wis. Dep't of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001); *see also Sallie v. Thiel*, 23 F. App'x 586, 589 (7th Cir. 2001) (applying this proposition to prison excessive force case). A jury would not have to believe Gill's version of events or his security-based motive. The video does not show Grant making a target glance. Grant says that he merely looked down as Gill placed a handcuff or tether on his restraints. Defendants argue that because Grant admits that he moved his head even after being directed not to do so, Gill was justified in pushing him into

the wall. But their stated justification continues to be a security-based one. Defendants do not explain how Grant looking down could have threatened Gill. The state also argues that the video shows that Grant was increasingly "agitated." But a jury would not necessarily have to agree with that characterization or make the logical leap that his agitation created more of a threat. Another reasonable way of looking at the video might be that Grant's incessant chatter got under Gill's skin. Slamming him into the wall out of frustration could violate the Eighth Amendment.

Grant theorizes that Gill had a different rationale: he was retaliating against him for exercising his First Amendment right to defend himself in his conduct report hearings. As discussed in more detail below, Grant's proposed finding that Gill earlier intentionally withheld breakfast from him because he chose to attend the hearing provides evidence that could lead a reasonable jury to believe that Gill wanted to punish Grant for attending the hearing. Grant also states—and the video shows—that Gill shoved Grant only after he was out of camera range, despite Grant turning his head several times while he was in camera range. This raises the inference that Gill's shove wasn't about Grant's head turn at all, but rather was born out of a retaliatory motive or his irritation with Grant.

As I discussed above, no matter the reason for Gill's actions, his shove would not violate the Eighth Amendment if I concluded that it was merely an exercise of de minimis force. And there is some support in the case law for shoves by correctional officers qualifying as de minimis. *See DeWalt*, 224 F.3d at 620 (7th Cir. 2000) ("The shove [into a doorframe] was a single and isolated act, unaccompanied by further uses of force. Moreover, the bruising Mr. DeWalt allegedly suffered does not appear to have been particularly serious."); *see also Hudson*, 503 U.S. at 9 ("That is not to say that every malevolent touch by a prison guard gives rise to

9

a federal cause of action. . . . 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights'" (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Moreover, although there is no de minimis *injury* standard, I note that Grant's injuries were minor. He says that he suffered no physical injury but he does state on the video that his jaw hurt from Gill's maneuver.

But ultimately I cannot conclude as a matter of law that Gill's actions constituted de minimis force. Grant's statement that he was "thrown" into the wall suggests that Gill's effort was more violent than a mere shove. And even given examples like *DeWalt*, I do not understand the body of Eighth Amendment excessive force law to give correctional officers carte blanche to slam inmates against the wall for no reason or malicious reasons. I will deny summary judgment to defendants on this claim against Gill. It will be up to the jury to decide how much force Gill used and his reasons for it. I will instruct the jury on the *Whitley* factors, as well as the de minimis force rule if the facts presented at trial give reason for such instructions.

Grant also brought an excessive force claim against defendant Bedker for not intervening in Gill's actions. At summary judgment he suggests that Bedker intentionally delayed in entering the room so that the altercation would not be on camera. It's true that Bedker did not capture the shove on tape, but nothing in the video raises a reasonable inference that this was intentional, given the distance he had to cover and relatively confined spaces in which they were working. Grant provides nothing more than speculation that Bedker conspired to allow Gill room to harm him off camera, so I will dismiss this claim against Bedker.[4]

---

[4] As mentioned above, *see supra* note 1, Grant suggests that Umentum attempted to block the recording by walking through the shot on his way into the hearing room. Grant did not include this claim against Umentum in his complaint, but even if he had, I would dismiss it because

**4. Strip search – excessive force**

As I discuss in further detail below, Grant brings a claim that defendants unnecessarily humiliated him by giving him a strip search following the altercation with Gill. But also, Grant recently clarified that he would like to bring an excessive force claim about the strip search. Grant alleged that he suffered severe pain from being handcuffed to the strip cage, and also suffered pain from defendant Beahm spreading Grant's buttocks, "forcefully" spreading Grant's fingers apart, and inserting his fingers in Grant's mouth.

Regarding Grant's handcuffs, it is unclear from the video whether Grant was actually tethered to the strip cage. The video does show that Grant stood facing the cage with his wrists handcuffed behind his back, while two defendants held his wrists.[5] He did complain about his wrist while he was at the strip cage, but nothing in the video shows the defendants twisting his wrists in an unnatural fashion, and Grant concedes that he was not physically injured. Grant had the opportunity at summary judgment to provide more detail about exactly why he believes that defendants' actions violated his rights with regard to his wrist restraints, but he has not done so. I do not doubt that having one's wrists handcuffed behind one's back could be an uncomfortable experience, but the record here shows no more than de minimis force used by the officers to secure Grant while he was being strip searched, so I will dismiss these claims.

---

the footage does not raise a reasonable inference that Umentum intentionally attempted to interfere with the shot.

[5] As stated above, the parties dispute which of the defendants held Grant's wrist. The video is dispositive, in a sense, because it shows the two men holding Grant's arms. But as an observer who cannot identify each defendant on sight without more information about what each person looks like, I cannot resolve the dispute at this point.

As for the strip search itself, it is important to clarify what this excessive force claim is *not* about. It is possible for a correctional officer to use even very minimal force during a strip search that could be maximally humiliating to an inmate. But that theory is discussed below. The question here is whether Beahm's allegedly "forceful" actions were excessively so given the circumstances. The video shows that they were not excessive. Regarding Grant's specific allegations, Beahm indeed spread Grant's buttocks, but he did not do so particularly violently or in a manner that would suggest a malicious attempt at causing pain. Although Beahm's actions in checking Grant's mouth are partially obscured in the video, nothing he did suggests excessive force. Beahm opened Grant's jaw with his hand and may have slightly inserted his fingers into Grant's mouth in the course of spreading his lips to check his gums. But those actions are completely consistent with an honest attempt at examining an inmate's mouth. Beahm spread Grant's fingers while other defendants held his handcuffed wrists. Grant said that this hurt, but nothing in the video suggests that this done maliciously to harm him. Rather, Beahm used minimal force to accomplish the appropriate security goal involved in checking Grant for contraband before placing him in control status.

**B. Retaliation**

I allowed Grant to proceed with retaliation claims against all of the defendants for their actions, on the theory that each of the defendants conspired against Grant to prevent him from exercising his right to defend himself in his conduct report hearings. To state a claim for retaliation under the First Amendment, a plaintiff must identify: (1) the constitutionally protected activity in which he was engaged; (2) one or more retaliatory actions taken by the defendant that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) sufficient facts to make it plausible to infer that the plaintiff's protected

activity was one of the reasons defendants took the action they did against him. *Bridges v. Gilbert*, 557 F.3d 541, 556 (7th Cir. 2009). Defendants focus on the third prong.

When I allowed Grant leave to proceed on retaliation claims, I explained the difficulty Grant might have in proving that each of the defendants meant to retaliate against him:

> The most difficult prong for plaintiff is the connection between the protected activity and defendants' alleged actions. But construing plaintiff's allegations generously, I conclude that he has alleged enough to raise a plausible connection: he seems to be saying that Gill took particular interest in plaintiff's participation in the conduct report hearing and was ready to take action against plaintiff if he did anything that could be portrayed as remotely provocative. Gill was then unnecessarily rough with plaintiff, and plaintiff was sent to a strip cage without Gill even calling for help, which suggests that the other defendants, all of whom were present for some of the events in question, yet failed to intervene, were in on the plan to harass plaintiff by strip searching him and giving him an additional conduct report for no reason. . . .
>
> But plaintiff should be aware that it will be much harder for him to prevail at summary judgment or trial than it was for him to proceed with these claims at screening. Plaintiff will have to support each of the elements of a retaliation claim with evidence proving his claims. In particular, to prevail against a particular defendant on a retaliation claim, plaintiff will have to show that the defendant acted the way he did in an effort to retaliate against plaintiff, rather than merely reacting to a call for help, otherwise acting in the normal course of their duties, or even acting out of animus toward plaintiff unrelated to his conduct report hearing.

Dkt. 17, at 4-5.

At summary judgment, Grant mostly fails to show how defendants meant to retaliate against him. For the most part, all he has in his favor in timing: his placement in control status directly prevented him from attending his conduct report hearings, the very right he was attempting to assert. But this does not in itself raise a reasonable inference that defendants acted against him *because* he was planning on testifying at those hearings. If the suspicious

timing of defendants' actions were the only piece of evidence he had supporting his retaliation claims, I would dismiss them.

But he has more, at least with respect to defendant Gill. Grant says that Gill intentionally withheld breakfast from him that morning because Grant was going to testify at his 2:00 hearing. Defendants argue that whether or not Grant was served breakfast is immaterial, but this is incorrect. If a jury believed that Gill intentionally withheld Grant's breakfast because Grant was planning on later appearing at his conduct report hearing, the jury could also reasonably believe that Gill's later use of force took place for the same retaliatory reason. Accordingly, I will deny defendants summary judgment on Grant's retaliation claim against Gill.

That leaves the rest of the defendants. Grant does not provide any evidence suggesting that any of them intended to conspire with Gill to further punish him. In his complaint, Grant said that at least some of the defendants arrived at the hearing room without actually having been called there, which suggested that they had prearranged the altercation and subsequent punishment. But the video shows that Umentum called for backup, so these defendants' appearance afterward cannot reasonably be attributed to retaliatory intent or a desire to conspire with Gill.

Schneider was the prison employee who decided that a strip search should be performed, but Grant does not explain why that decision was retaliatory, given that Schneider was working off of Gill's report of an altercation. Likewise, there is no evidence that Beahm or any other of the defendants present at the strip search acted the way they did for any reason other than following Schneider's orders.

Grant alleged that Meli's conduct report was retaliatory. The facts at summary judgment detail Meli's involvement slightly differently—Gill *issued* the conduct report and Meli *approved* it—but nothing in the record shows that Meli acted with a retaliatory motive in approving it; he had no reason to doubt Gill's narrative. Finally, Grant concedes that defendants Marwitz and Kitzman had no involvement with the events at issue in this lawsuit. Because Grant fails to present evidence that could lead a reasonable jury to conclude that any of the remaining defendants retaliated against him, I will grant those defendants summary judgment on Grant's retaliation claims.

**C. Strip search – humiliation**

I allowed Grant leave to proceed on claims that defendants violated his Eighth Amendment rights by giving him an invasive "staff-assisted" strip search for the purpose of humiliating him rather than for any legitimate penological purpose, that Beahm conducted the search in a manner meant to humiliate Grant, and that the other defendants who were present during the strip search did nothing to stop Beahm from conducting the search in an inappropriate manner.

A strip search violates the Eighth Amendment when it is "conducted in a harassing manner intended to humiliate and inflict psychological pain." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004). Stated another way, the question is whether there was a legitimate penological reason for both the search and its scope. *Whitman v. Nesic*, 368 F.3d 931, 934–35 (7th Cir. 2004); *see also Vasquez v. Raemisch*, 480 F. Supp. 2d 1120, 1131–32 (W.D. Wis. 2007) (stating that case law "supports a conclusion of heightened protection for a manual as opposed to visual inspection.").

As discussed above, the video evidence shows that defendants did not use excessive force during the strip search. By the same token, nothing in the video suggests that defendant Beahm's technique in performing the search was intended to humiliate Grant. Rather, the video shows a routine staff-assisted strip search. Although this type of a search by definition includes unwanted touching, that alone is not enough to violate the Eighth Amendment: prison staff need to be able to conduct admittedly invasive searches this one where there is a legitimate penological purpose for doing so. *See, e.g.*, *Simpson v. Mason*, No. 13-cv-776-jdp, 2015 WL 5918928, at *13 (W.D. Wis. Oct. 9, 2015) ("While forcibly lifting a man's testicles and spreading his buttocks would be sexual assault in the outside world, it is part and parcel of a staff-assisted strip search serving the legitimate penological purpose of keeping the prison secure by ensuring that no prisoner transports contraband. Plaintiff seems to equate any unwanted touching with sexual assault but this is simply not the standard for prison strip searches.").

Even a strip search conducted with appropriate methods could violate the Constitution if the reason for conducting it was to humiliate a prisoner rather than for legitimate penological purposes. But as with his retaliation claims, Grant does not provide any evidence suggesting that defendant Schneider acted with a motive other than a legitimate one in choosing to have him strip searched. There is no indication that Schneider conspired with Gill to punish Grant. Rather, Schneider responded to Umentum's call and ordered Grant placed in control status after hearing the report of the altercation between Gill and Grant. Therefore, I will grant defendants summary judgment on all of Grant's strip search claims.

CONCLUSION

This case will proceed to trial on Grant's excessive force and retaliation clams against defendant Gill. I will follow this order with an order setting forth some trial preparation instructions for Grant's benefit. Although the December 6 final pretrial conference and December 11 trial dates will remain in place, I will amend the pretrial submission dates slightly to give the parties more time. The new pretrial submissions and disclosures deadline is November 16, 2017. The new response deadline is November 28, 2017.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 40, is DENIED regarding plaintiff James Edward Grant's excessive force and retaliation claims against defendant Jeffrey Gill. Defendants' motion is GRANTED on all of plaintiff's other claims.

2. Defendants Beahm, Lunde, Bedker, Olig, Kitzman, Umentum, Schouten, Lukas, Marwitz, Schneider, Greff, and Meli are DISMISSED from the case.

3. The schedule is AMENDED as stated in the opinion above.

Entered October 30, 2017.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge